May it please the Honorable Court, Richard Schoenfeld, appearing on behalf of Appellant Linda Marie Kot. I'd like to preserve five minutes for rebuttal, if I have that much time left when I complete. Okay. Go ahead. Thank you. Today I'm going to focus the majority of my argument on the improper prosecutorial vouching that occurred as it related to six of the ten witnesses called by the government. And the reason six is so significant is the last four witnesses are what the courts have previously called, in other cases, peripheral or minor witnesses. They were bank employees, essentially custodian of records, or witnesses testifying only as the materiality aspect of the fraud allegations in the case. So the six witnesses that were vouched for were the substantive witnesses called by the government. We know from Combs and Jeston and Harrison that it is black-letter law that a prosecutor may not ask a defendant to testify as to the truthfulness of other The government concedes that the error, the vouching, was, in fact, error, and that it rises to the level of clear error. So the only question for this Honorable Court is whether that error is harmless or harmful. And the analysis as to that boils down to whether or not it affected Appellant's substantial rights and seriously impacted the fairness and integrity of her trial. We find that in Combs. I respectfully submit that it does, because it was as to every single substantive witness. It was a substantive witness in this case. Sotomayor, alas and alack, we have a lot of cases in this circuit on vouching. What is the closest case in your view to this one, and why is it close? I would say it's either Combs or Jeston. And the reason that those two are close, there's really four cases that have been cited in both the opening and responsive briefs. There's Combs, Jeston, Harrison, and Moreland. And I think Combs and Jeston are the closest, because what it boils down to is what independent evidence excised the vouched witnesses, what independent evidence exists to support the conviction. In this case, there is none. There were two pieces of documentary evidence in this case that became disputed. One was a verification of rent, and the other was that two of the alleged straw buyers were added to the Appellant's bank accounts. The Appellant testified. She said that the verification of rent for $1,200 instead of the $400 that Mr. Palladino was actually paying was because there were three tenants in that house, each paying $400. It totaled $1,200. A valid explanation. However, Mr. Palladino contradicted that explanation, but he was a vouched forewitness. The other testimony was that Luis Campa and Mr. Campa were added to the Appellant's bank account. The Appellant testified that she did not have knowledge that those people were added to her bank account, nor did she authorize that. Well, I guess, but the bottom line is you have to, you know, there's a lot of evidence against your client, even though you're taking a different view. But there does seem to be quite a bit of evidence. And so even though they've admitted that they shouldn't have phrased it that way, doesn't it sort of come down to, you know, is it really a distinction without a difference from the standpoint that if you believe one person over the other, either one's mistaken or they're lying? That's what credibility – that's what happens in credibility. And so while it was a poor choice of words, why does that really, you know, they could have believed your client and they didn't? Well, and I appreciate the question, but I respectfully submit that this isn't a case where it's a poor choice of words. This is a case where each and every witness was vouched for by way of – and without those witnesses, there's no other evidence. Well, but what the question was, what, if then you're saying that they were lying? Here's – And so did the prosecutor say, I know these people outside of this arena and I know them, they go to mass every Sunday and I know they do community service and bring in all this extrinsic stuff and they've just been awarded the humanitarian of the year award. You know, there wasn't anything extrinsic came in. It's just like, okay, if you say this, does that mean they're lying? I have two responses to that. First, the vouching was more than just one, well, that person must be lying. It was as to each of the six witnesses and there was a series of questions. Was anything extrinsic brought in? In closing, yes. Under Roberts, the government also impermissibly on direct examination of Jeff Palladino brought in evidence that he had a diversion agreement and that his requirement under that diversion agreement was to tell the truth. On direct examination of Mr. Perry, the government brought in that he had a guilty plea agreement and under the plea agreement, yes. Counsel, maybe I'm wrong, but that strikes me as a very traditional kind of inquiry that the government does. That's impeachment, that they have a motive. Well, but it was brought in on direct examination by the government. Well, the government can do that. They can anticipate that the defense through cross-examination will bring that out. In my experience, at least, that the government does that all the time and that's not – I don't know what's vouching about that. They're just – they're not, as my colleague suggests, bringing in extrinsic evidence that might suggest that the government knows things about the witness that the jurors don't, all of which support the credibility of the witness. That's just a – there are these plea agreements, they have certain requirements, and the government's entitled to bring that out. However, in U.S. v. Roberts, the Court recognized a strong case can be made for excluding a plea agreement's promise of truthfulness. The witness who would otherwise seem untrustworthy may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation. And in this case, it's not the prosecutor.    It's the prosecutor who has to come forward and convey this message. And the prosecutor would rather have a witness that didn't – isn't part of the whole thing. But it's kind of – you know, it's one of these – the first to squeal gets the deal and then you have to bring these people in that are convicted felons, or, you know, they're gaining something by virtue of coming in and testifying. And they did get something, because your client argues later that she should have gotten the same deal that they got by virtue of pleading without a trial, right? I got too much now. I think it makes them look shadier. I'd much rather have someone that doesn't have anything to do with it come in and, you know, that they have no – these people have a clear benefit that they're trying to get, and the defense attorney has got to bring that out. So the prosecutor is trying to soften it. But the problem is, Your Honor, that it's impermissible. Under U.S. v. Roberts, it specifically says either doing it explicitly or implicitly in closing argument, and it was also done in direct examination, is impermissible. They are suggesting that because, number one, they tell the jury, either you believe the appellant, the defendant Linda Marie Cott, or you believe all six of these people, because she says they're lying. And then on top of that, they say, look at the witness's motive not just to lie, but to tell the truth, which is a violation of U.S. v. Roberts. They bring in all three of the witnesses who had agreements, one diversion, two guilty plea agreements, and the requirement that they tell the truth. If they don't tell the truth, their deal with the government is sloaned. They vouch for every one of those witnesses in their examination. Oh, so, well, this witness said X, Y, and Z, so they must be lying. Repeatedly, with all those witnesses, they sum it up in closing. They sum up the improper vouching for the six witnesses in their closing. They then say that you either have to believe the appellant's version of events or their version of events. They then say, look at their motivation to tell the truth, stating that they have an agreement with the government. If they don't tell the truth, their deal is off. Those are all, under the case law cited, absolutely improper vouching. The only question is whether or not it's harmful or harmless. And the fact that they did it to each and every substantive witness in this case, it is clear that it's harmful error.    I don't think it's appropriate to concede that the prosecutor should not have asked your client whether other witnesses were lying. That's clearly improper. They acknowledge that. But they certainly don't acknowledge that there's anything wrong, for example, about asking the witnesses about the plea deals and the obligation to tell the truth. They don't concede that at all, do they? They don't concede that that was improper vouching. They acknowledge that it occurred. And I believe in one statement, they said that the prosecutor probably shouldn't have mentioned the improper questioning in their closing. But they do not concede that the references to the plea agreements or calling the defense Hail Mary pass, things of that nature, were improper. But obviously, we submit that it is. Well, that certainly suggests that the law is not as straightforward and clear on this – on the vouching issue that you – that you suggest. Well, however, respectfully, I disagree, because the Combs, Jetson, Harrison, Moreland, those courts have stated that the improper questioning is vouching. It's a different form of vouching. So as to those areas, it is absolutely considered vouching under those cases, and the government concedes that those questions were improper. I'm adding that in coupling that with the – what I believe to be improper vouching in the closing argument, referencing the plea agreements, referencing the prior improper questions, referencing the defense as a Hail Mary pass, things of those nature, just added to the harmfulness of – the cumulative harmfulness of the error in this case. And when we look at some of the questions, for example, in closing argument, the prosecutor referenced this, where they talk about Jeffrey Palladino. They reference how this person looked up to my client as an aunt, and the question on the stand was, he wasn't going to share in the proceeds miscaught. He wasn't going to get a flat fee. Is that correct? Her response, sharing in the proceeds, whatever that comes to, and that was the arrangement with Michael. So he lied is your position on that subject. No, he didn't say that it was up front, sir. It's your position that Mr. Palladino lied. Yes, sir, it's my position that he lied. The young man that looks up to you as an aunt, whose credit you put at risk, even though his credit didn't get ruined, whose credit you put at risk when you put a property in his name, that young man who looked up to you as an aunt, he lied? That's your testimony, ma'am? Answer, we never put a property in his name. Ma'am, it's your testimony that he lied. That part, yes, was not true. And they reference that again in closing argument, that you have to disbelieve either you believe the appellant or you believe these six witnesses, and then they go through all of the improper questions that they asked in examination. This person that looked up to her as an aunt, why would he lie? Think of his motive. Think of, and when they say his motive, his motive to tell the truth references back to the diversion agreement. He's required to tell the truth. You see, I look at that as, I look at that as a negative on that witness, not a positive, that they've made deals and then they're coming into court. They're not, they're not, in my view, it's not like, it's like the two people that have a car accident, both of them have a reason, possibly, to see it from their own standpoint. The person that's standing on the corner that wasn't involved in the accident is often the person that breaks the tie, whether the light was red or whether the light was, you know, green when they went through. So I think those are negative things. And normally that's how a defense lawyer would question the person. You have motivation to fabricate, you have motivation to lie, you've lied in the past, things of that nature. But the problem is that the government's improper vouching on examination when they were talking to my client, the appellant, regarding, well, then this witness lied, that witness lied. It took away that benefit that the appellant had in cross-examining those witnesses because the government then bolsters their testimony with improper vouching. So normally, I absolutely agree, that's something defense lawyers would absolutely do. You made a deal with the government, you're an admitted liar, things of that nature impact their credibility. But the improper vouching in this case negated that effect or the impact that it would have on that witness's credibility. Were you trial counsel? I was not. Okay. And when you excise all of the vouched for evidence, you have absolutely nothing left in this case. You have my client's explanation as to what happened. So it boils down to a credibility contest, which is what the court in Jeston and the court in Combs said is reversible error. You take a look at the Harrison analysis where they found that it was improper vouching and that it was clear error, but it was harmless error. And in that case, they looked at the independent evidence. The person was accused of beating up an officer. He had blood on his knuckles. That was one example. They looked at the two witnesses who weren't vouched for, who gave independent evidence and testimony that they observed the occurrences in question. They observed the heightened level of intoxication, which contradicted the defendant in that case's testimony. The defendant in that case admitted that he had reported a car stolen when really the car was in possession of the police department, a fact that became at issue. They had all of these items of independent evidence separated from the vouched for testimony. We look at both Jeston and Combs. They did the exact same analysis as to whether or not it was harmless error. They excised the vouched for testimony and said, what's left? In this case, when we excise the vouched for testimony, there is nothing left except my client's explanation. It boiled down to a credibility contest. The very thing that the court said was harmful error in Jeston, Combs, and in Harrison, as I explained, they found that there was independent evidence. The final case that the government cites in reference to the vouching is Moreland. In that case, there were 75 witnesses called. As to two of the witnesses, the prosecutor did the same type of vouching in this case where they said, well, then you're saying that those other witnesses lied. The court in Moreland found that it was harmless error because those were two witnesses that were peripheral and testifying as to minor subject matter in the case out of 75 witnesses. In this case, we can't say that they're peripheral witnesses. They were these substantive witnesses, and we can't say that it was harmless because absent those vouched for witnesses, there's absolutely nothing left as it relates to my client. Roberts, isn't there a lot of documentary or a lot of transactions here? Is there a lot of documentary evidence, including documents that have your client's signatures, which were these documents were necessary for these fraudulent transactions? There's a lot of that in this record, isn't there? Yes and no. We have to keep in mind that my client was a realtor. She was not the mortgage broker, the loan officer, the straw buyer. So she did not present any of the false statements to the lenders. The evidence that the government presented through the vouched for witnesses is that she had knowledge of those false statements. But without that testimony, the only thing that is left is that two people were added to my client's bank account and that she did the verification of rent. However, she explained those clearly and succinctly. And if the jury believed her explanation, it would have resulted in a not guilty verdict because the government wouldn't have met the elements. So while there are documents related to the real estate transactions in this case, there is nothing in those documents that without testimony from a vouched for witness would have resulted in a conviction. And I'll reserve the remainder. Thank you. Good morning. Good morning, may it please the court. Ellen Meltzer on behalf of the United States. There's no question in this case. Could you move your mic down just a tad, get a little closer there? Great, thank you. Sure. There's no question in this case that the prosecutor asked Mrs. Cotton more than 20 improper questions about six different government witnesses. It was wrong of him to ask her those questions about whether the witnesses were lying about certain specific facts. He shouldn't have asked the questions. He didn't know at the time that he asked the questions that the questions were improper. He now knows that and it certainly will never happen again. So the issue before the court is not whether or not the prosecutor erred, because he did. The issue is whether the error requires reversal. We submit that it does not, because Ms. Cott has not met her burden of showing that these improper questions affected her substantial rights or affected the outcome of the trial in any way. There are several reasons for this. First, contrary to what defense counsel just said, the case was about a lot more than whether she submitted a false verification of rent for Mr. Palladino, showing that it was $1,200 rather than $400, and whether or not she authorized CAMPA and ORTES to be on her bank accounts. For starters, during the opening statement, the trial defense counsel attacked the veracity of the government witnesses and claimed that, as he put it, Kootland's band of thieves lied before and they would be lying during the trial. Contrary to what counsel said in his reply brief, the government never claimed that the improper questions were justified in any way because of the opening statement. They weren't. But when the prosecutor asked Mrs. Cott whether or not these witnesses were lying, it certainly was not the first time that the jury was hearing that. They had already heard it from defense counsel. Second ---- Well, what do juries do except decide who's telling the truth and who's lying or who's right or who's mistaken? So is that the worst thing in the world, that you say someone's lying? No. I don't believe that it is at all. And in fact ---- Because if they were telling the truth, then, I mean, you know, if Ms. Cott was telling the truth, she shouldn't be prosecuted. That's correct, Your Honor. And in fact, the court instructed the jury that they were to consider her testimony like that of any regular witness. But they did instruct the jury that in determining witness credibility, they should scrutinize the testimony of those who had pleaded guilty with more caution than those of the other witnesses. This wasn't a pure credibility contest between Cott and the government witnesses. And contrary to what was just said, there was substantial other evidence in this case. In fact, it was overwhelming. As to the documentary evidence, excuse me, Mrs. Cott received commissions of over $276,000 for these transactions, both for those in the Clutalin Trust and for the three Maria Pinheiro transactions. Almost all of the loan applications that the trust principals and the investors filed contained false statements as to salary, as to income, as to employment, as to whether or not the purchasers would be occupying the residences as their primary residence. There were signature cards that had Campa's signature on it and Cott's signature, signature cards that had Ortiz's signature and Cott's signature. Ortiz's name was on bank accounts that she received. Campa's name was on bank accounts that she received. Mr. Perry's name was put on her corporate account as opposed to her personal accounts where Ortiz and Campa were placed. Perry's name appeared on those account statements that she received. Mr. Palladino's loan applications falsely stated that the Button Ridge property would be his primary residence. He testified that she made that suggestion to him, that he put that down falsely. Mr. Campa's loan application had her account number on it. The verification of deposit the Bank of America submitted to Campa's lenders and to Ortiz's prospective lender had bank balances that exactly matched the balances in Cott's checking account at that time. Mrs. Cott paid down Maria Pinheiro's credit cards. She paid down $2,200 in credit cards, and yet after that sold her three properties that exceeded $2 million in value. Counsel, the way you're sort of arguing harmless area, I get you almost seem to be supporting what opposing counsel is saying. You're relying on all this documentary evidence. Are you accepting the proposition that the testimony of these witnesses who were the subject of improper vouching, that their testimony should be disregarded in doing the harmless error analysis? Is that what you're saying? I don't, well, it's not a harmless error analysis. It's whether or not she's met her burden. It's her burden to prove that the testimony affected her substantial rights. It's not our burden to prove that it was harmless. Because there were no contemporary objections. Exactly. There were no objections to any of the questions. All right. But it's a kind of, I understand that, the burden is theirs. But it's still a kind of harmless error analysis, right? Yes, but I don't. Burden is different. I understand that. I don't, in response to your question, I don't believe that the court has to completely ignore all testimony from these six witnesses. I think in doing the analysis, they ignore the subject matter of the improper questions. But I don't think, I haven't seen any cases that say that they have to ignore every single thing that these six witnesses said. Well, you're presenting it then for the fact that you're saying what they said comports with this basically undisputed documentary evidence. So that supports your position that it didn't really affect them on what they were saying. No, some of the documentary evidence that I just cited was not the subject matter of the improper questions. And in addition, there were certainly areas about which these witnesses testified which were not the subject of the improper questions. Such as the fact that Mrs. Cott told Clutalin and Perry that they should put furniture in their windows and get mail delivered to their houses so that it would appear that they were really their primary residences. They were never questioned about that by the prosecutor. In addition, excuse me. There were other areas in which the witnesses testified and they weren't asked any improper questions. In addition to what I just said about the furniture and the mail being delivered, Mr. Perry testified that Mrs. Cott offered to put other people on her bank accounts. That he heard her say that Clutalin could be on her bank account, that Thomas could be on her bank account. That other people could also be on her bank accounts. She was never asked that by the prosecutor. She also referred to Mrs. Pinheiro as a straw buyer and told people that straw buyers get paid $10,000. She helped Mr. Ortiz with his mortgage payments so that he could qualify for a loan and so that his credit rating would remain satisfactory. She wasn't asked about that. She instructed Campbell to line his loan application. And she was never asked about that. She also attempted to recruit Mr. Dadey, the banker at Bank of America, as a straw buyer, and she wasn't asked about that during cross-examination. So there's a lot more than just documentary evidence that corroborates the subject matter of the improper questions. She also made certain admissions during her testimony. She admitted that she temporarily deposited $42,000 in Mr. Palladino's account. She admitted that she paid down Mrs. Pinheiro's credit cards, because as she said, Mrs. Pinheiro was in dire straits. And admitted that she then sold her the three additional properties and tried to sell her a fourth property. In addition, when one lender declined to approve Maria Pinheiro's purchase of the fourth property, Mrs. Cott sent an email suggesting that that loan application go to a different lender who might approve it, even though Mrs. Pinheiro couldn't even pay $2,200 for her credit cards. She also admitted that the homes that were purchased in the names of her parents were ones in which she made all the mortgage payments, and she paid all the expenses, and she paid for the appraisals, and she paid for the closing costs. And that the applications were done in her parents' name to make it easier for them to obtain a loan. She wasn't asked about that on cross-examination. And she also admitted that she paid closing costs for some of the buyers, and that she paid the finder's fees to Coodling of over $100,000 for bringing in Maria Pinheiro as a straw buyer, although she certainly didn't use the term straw buyer. So it's not just the documentary evidence that corroborates the subject matter of the improper questions. As, if I might address the vouching question on the closing arguments, we certainly did concede in our brief that the prosecutor's statement about the Mrs. Cott stating that the witnesses had lied was improper. But the prosecutor's comments about the plea agreements for Coodling and for Perry and about the pretrial diversion agreement for Palladino were in no way improper. The prosecutor's comments about the plea agreements and the possibility of being prosecuted for perjury, if indeed they lied, were a fair response to Mrs. Cott's argument in closing that the witnesses were lying because of their 5K1 substantial assistant agreements. He is the one that brought that out in closing argument, not the government. And we have a right to respond fairly to those kind of comments. He also stated during his closing argument that Mr. Palladino had a motive to lie because he still had a pretrial diversion agreement. The government had a right to respond and say that that pretrial agreement had been completed, which is what Mr. Palladino testified to during his direct examination. Counsel, in conducting the direct inquiry of some of the government witnesses who entered these plea agreements, did the government, in anticipation of how the defense might use those plea agreements in cross-examination, did the government refer the witness on the stand to those plea agreements and ask questions about what obligations they had in light of those plea agreements? The questioning was very brief. I know as to one of them, the only questioning is, did you plead guilty? Yes, what is your obligation to testify truthfully? That was the entire questioning, and I believe it was fairly similar for the second witness. And is it your position that that was appropriate questioning? Yes, it is, Your Honor. I'm not aware of any case in this circuit which precludes the government from asking simple questions such as that. If I might make one last comment. Opposing counsel was asked which case he thought this was closest to in the circuit. And it's the government's position that this is closest to the Harrison case, which, Your Honor, was on the panel for. In Harrison, approximately 26 improper questions were asked of two military police officers who testified. The court found that it didn't prejudice the defendant, because there was also physical evidence that corroborated the defendant's guilt. And two additional police officers also testified as to the alleged assault. There was, in that case, unlike in this case, patent vouching of the witnesses. I believe that the government made some statement about we stand behind these witnesses, which the government certainly didn't do in this case. It wasn't a close case, and we don't believe that this is a close case either. There were no personal opinions expressed in this case, and we believe that the evidence was overwhelming. In addition, I think a better fact for the government than was in Harrison is the witnesses of whom we asked the improper questions were not police officers. They weren't government agents. And this court, in the cases that it's reversed, such as Combs and the DE agent in Combs, was asked about a government agent in Guestin. And I think that it's the tendency of juries to give more credence to law enforcement witnesses, and so the questions really could have affected the outcome of the trial. Here, these were lay witnesses. They were not agents. They were not officers in any way. Unless. Thank you. If there are no further additional questions. Thank you. I want to start off by responding to the suggestion that there was an invited response in closing argument, and I will point the Court to excerpt of Record 603. It was in the government's closing, not their rebuttal, that they said the following. Mr. Ortiz, Mr. Campa, Mr. Palladino, they all took the stand. They admitted their wrongdoing. They admitted they broke the law. Mr. Brown would like you to believe that all these people are lying. In fact, the defendant told you from the stand that all these people have lied. Now, the judge instructed you on credibility, and I hope that you will take into account all of the witnesses, their demeanor, how they appeared on the stand, your visceral impression of them. I also hope, strike that, you also should take into account their motive to tell the truth. Mr. Kootland and Mr. Perry both talked about their plea agreements, and they both said that all the government ever told them to do was tell the truth. If you were to believe the defendant's version of events, then that would mean that all these witnesses were lying. Mr. Palladino's lying. Mr. Palladino, who thought of the defendant as an ant, is lying. Mr. Ortiz is lying. Mr. Kootland is lying. Mr. Perry is lying. And Mr. Campa. Well, the government has acknowledged that the questions of Ms. Cott as to whether or not these people were lying were improper, and there it is in closing argument reaffirming it to the jury. In US v Roberts, the court has stated that explicitly outlining the truth-telling portion of a plea agreement is improper, and there you have the government doing that in closing argument. The government wants this court to do something that it hasn't done in any of the other cases when analyzing this type of error, and that is to give credit to the non-vouched-for portion of testimony of the vouched-for witnesses. That has never been the type of analysis that has been performed. Justin, Combs, Harrison, Moreland, you excise the vouched-for witnesses, and then you look at the remainder. The government spent a couple of pages in their brief and spent some time in their argument outlining the other testimony of the vouched-for witnesses and how that establishes guilt. That is not the process that has previously been employed, nor should it be employed, because those witnesses were vouched for. Regardless of what topic the vouching occurred on, those witnesses are vouched for, they are tainted. If you look at the remainder of the evidence, and you look at the appellant's testimony, it comes down to a credibility contest. The appellant gave an explanation as to what the government has claimed as independent evidence. She's allowed to receive commissions as a realtor. She explained that she didn't authorize the two people to be placed on her account. Without the testimony of the vouched-for witnesses, there is nothing to rebut her explanation as to a lack of intent, as to lack of knowledge of the false statements on the loan applications, and as to a lack of any participation in a conspiracy. So the government can't acknowledge, in one sense, that they improperly vouched for these witnesses, but then, on the other hand, want to use these witnesses to support their so-called independent basis for the jury to find a conviction in this case. That's what the government is attempting to do. Finally, the government has also suggested in their brief that the vouching was invited by the defendant. As stated, the vouching occurred in closing, not in rebuttal closing, and the instructions don't cure it. In Shaw and Parker, two cases cited by the government for the notion that the general jury instructions cure this type of vouching. Those were limited instances of vouching in closing argument. One was invited by the defense lawyer in Parker, where he said, look at their motive to lie. They have these plea agreements. They want to make the government happy. In response, the government merely stated, as an officer of the court, I will inform the sentencing court whether or not the witness was truthful. That's my obligation. Court found that to be harmless error because that is, in fact, a prosecutor's obligation, and it was one remark that was improper vouching. And in Shaw, similarly, it was one comment regarding the improper vouching. And in that case, the court found it to be harmless because the defense lawyer forcefully stated in his closing argument that the government has no method to assess the truthfulness of a witness's testimony. And therefore, the truth-telling requirement in the plea agreement is irrelevant. That didn't occur in this case, and we have a mountain of improper vouching. When we set that aside, there is no independent evidence, and clearly it impacted the appellant's right to a fair trial. All right. Thank you for your argument, both of you. This matter will stand submitted, and this Court's in recess until tomorrow at 9 a.m.
judges: Schroeder, Lipez, Callahan